400 So.2d 103 (1981)
SCHOOL BOARD OF LEON COUNTY, Appellant,
v.
Mary E. HARGIS and Florida Commission On Human Relations, Appellees.
No. WW-222.
District Court of Appeal of Florida, First District.
June 16, 1981.
*104 Charles A. Johnson, Tallahassee, for appellant.
Aurelio Durana and Larry K. White, Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Judge.
This is an appeal by the Leon County School Board from a final order of the *105 Commission on Human Relations, following referral to the Division of Administrative Hearings for a hearing and recommended order, Section 120.57, in which the Commission ultimately finds that the Board illegally discriminated because of race against a black employee, Mary Hargis, by refusing to permit her to apply and be considered for a certain food service job in Fairview Middle School. Section 23.167(1)(a), Fla. Stat. (1979). We reverse the Commission's order because it improperly substitutes the Commission's view of disputed facts for that of the hearing officer who conducted the evidentiary hearing; but, finding in the Commission's order and briefs a possible alternative ground for the Commission's decision, involving questions of policy and procedure on which the Commission's views are entitled to greater deference, we remand the case to give the Commission a further opportunity to enter an order satisfactorily expounding those views on a proper record foundation.
The Human Rights Act of 1977, Section 23.161 et seq., prohibits unfair employment practices discriminating "with respect to compensation, terms, conditions, or privileges of employment, because of ... race, color, religion, sex, national origin, age, handicap, or marital status." Section 23.167(1)(a). To remedy such discriminatory practices the Act creates the Florida Commission on Human Relations, a 12-member body appointed by the Governor and confirmed by the Senate, drawn from "various racial, religious, ethnic, social, economic, political, and professional groups within the state." Section 23.163. The Commission is empowered to receive and consider complaints of discriminatory employment practices and, finding that such a practice has occurred, to "issue an order prohibiting the practice and providing affirmative relief from the effects of the practice, including reasonable attorney's fees." Section 23.167(13). The Commission's actions are subject to the Administrative Procedure Act, Chapter 120.
At the time of the events giving rise to the complaint, Hargis was employed at Fairview School in a food service position identical to the one for which she made futile application in September 1978, except that the job she wanted offered five-and-a-half hours' work each day and the job she held offered but three-and-a-half. In October 1977 a fellow worker in the five-and-a-half hour job at Fairview School was taken ill, and Hargis and other three-and-a-half hour workers were given an opportunity by the food service manager to speak for the extra-hours job on a temporary basis. Only Minnie Barfield, who is Caucasian, spoke for the extra work. Hargis declined due to a conflicting schedule for taking her children to school. Barfield therefore was given the extra two hours' work on a temporary basis, pending the return of the incumbent, who was granted leave without pay. Then began a series of administrative misadventures. First, in January, School Board records unaccountably transferred Barfield permanently to the ill incumbent's position for pay purposes, though the incumbent was not ousted. Then, when all "permanent" appointments expired at the end of the school year, the Board's personnel mechanism routinely ground out invitations to all eligible "permanent" 1977-78 employees, calling for them to express interest in reappointment to their respective permanent positions for 1978-79. To this invitation Barfield said yes, and an appointment form was issued on August 3, 1978, duly approved by the School Board, appointing Barfield anew to the five-and-a-half hour permanent position for the 1978-79 school year.
On August 17, the former incumbent, who had been carried in leave-of-absence status for the last several months of the past school year, resigned. A vacant permanent position was thus at last created, which the Board's personnel mechanism recognized as such. In due course the Board published and posted at Fairview School a job opportunity bulletin. The hearing officer found:
Respondent's [School Board's] personnel department issued a Job Opportunity Bulletin on September 5, 1978, announcing the vacancy which stated that anyone *106 interested in being considered for the position should contact the personnel office before the application deadline of September 12, 1978.
At this point, events critical to the evaluation of this Human Rights Act complaint ensued. The union contract applicable to food service workers provided that employees applying for a vacancy must be considered before an employment decision is reached. And the School Board's applicable employment directive provides that applicants for a position must file an application with the personnel department and that, after close of the advertising period, a list of qualified applicants is to be submitted to the school principal for interviews, followed by the principal's recommendation to the personnel department, followed by the appointment. In practice the Fairview School food service manager rather than its principal conducts interviews and recommends food service appointments.
On about September 6, 1978, Hargis saw the Job Opportunity Bulletin posted in the School Board's administration building and made inquiry concerning the advertised position at the office of the Board's director of food service, who a month earlier had routinely recommended Board appointment of Barfield, as stated above. Upon inquiring, Hargis was advised by an employee in the office that the job had already been filled. Hargis went next to the Fairview School principal, who told her he would look into the matter. He did so and was advised by his school manager of food service "that she had not offered the job to [Hargis] because [Hargis] had previously declined the position in 1977." Hargis then pursued the matter with her food service manager, who confirmed that Barfield would retain the position because she had worked in it the prior year. Neither Barfield nor Hargis ever filed a written application for the "permanent" 1978-79 appointment.
Hargis thereupon filed her complaint with the Commission on Human Relations. Although empowered by statute and its rules to hold factfinding hearings itself,[1] the Commission assigned the case for hearing to DOAH, whose officer conducted a hearing and heard the witnesses. The hearing officer, after making appropriate findings of fact essentially as we have narrated the events above, announced as a "conclusion of law" that the School Board was negligent in assuming the job was already properly filled when Hargis inquired about the opening and was negligent in failing to follow contractual hiring procedures, but that "no evidence was presented at the hearing from which it can be concluded or even inferred that [Hargis] was the subject of unlawful discrimination because of her race or color." The hearing officer thus recommended that the Commission dismiss the complaint.
After a nonevidentiary hearing on the recommended order, the Commission issued a final order adopting the hearing officer's findings of fact but substituting "conclusions of law" to the effect that the School Board's nondiscriminatory explanation for its failure to hire Hargis  a claimed "lack of coordination and communication in advertising the vacancy"  was "merely a pretext for racial discrimination against Mrs. Hargis." In reaching this conclusion the Commission emphasized Hargis' qualifications for the job, including her seniority over Barfield; the informality of procedures by which Barfield was deemed selected for the position "prior to the proper posting of notices and without complying with [the School Board's] collective bargaining agreement"; and, seemingly most important, the School Board's failure to take corrective action to reopen the appointment when, in September 1978, both the Fairview principal and its food service manager were apprised that the selection process had excluded from consideration a qualified employee, *107 the only black food service worker at Fairview. The Commission stated:
It can only be concluded that [the School Board] knew of the racially discriminatory impacts of its decision and that [the Board] intended the consequences of its acts.
Finally, the Commission stated it was "obvious that [the School Board] ... sought to cover up its unlawful activity by posting of vacancy announcements after the employment decision had been made."
Obviously the Commission's conclusions are in irreconcilable conflict with the hearing officer's conclusion that
... no evidence was presented at the hearing from which it can be concluded or even inferred that [Hargis] was the subject of unlawful discrimination because of her race or color.
In determining the propriety of the Commission's substitution of ultimate findings for those of the hearing officer, we give no great weight to the labeling of the conflicting findings as "conclusions of law" rather than "findings of fact." Though the hearing officer's labeling informs us that he properly sensed the presence of policy and legal considerations in the task of weighing the evidence of racial discrimination, and he chose not to mask his ultimate finding as wholly a finding of fact, we nevertheless give the hearing officer's finding effect to the extent the issue was "simply the weight or credibility of testimony by witnesses," or was determinable "by ordinary methods of proof," or was in a factual realm concerning which "the agency may not rightfully claim special insight." McDonald v. Dept. of Banking and Finance, 346 So.2d 569, 579 (Fla. 1st DCA 1977). On the other hand, to the extent that "the ultimate facts are increasingly matters of opinion and opinions are increasingly infused by policy considerations for which the agency has special responsibility," we shall honor the Commission's substituted findings.
As factual descriptions of the discernible motives of the actors in this controversy, most of whom were witnesses, the Commission's findings of "pretext for racial discrimination" and "cover-up [for] unlawful activity" are highly problematic. Ordinarily those questions of credibility, motivation, and purpose are questions determinable by the factfinder. Indeed, the Commission itself recognized:
There is no direct evidence of discriminatory intent in the instant case, and such evidence is seldom present. Therefore, circumstantial evidence, or inferences, may be relied upon to establish discriminatory motive... . The ultimate inquiry, in examination of the issue of discriminatory intent, is whether the decision or action in question was racially premised... .
We cannot escape the conviction that the Commission, in characterizing the actors' conduct as "racially premised," improperly invaded the factfinding function of the hearing officer to whom, though it need not have, the Commission referred this matter for an evidentiary hearing. Given a neutral record such as this, on which a hearing officer could properly describe the case as one of administrative negligence or, at most, negligence plus obstinacy  those being human afflictions quite as authentic as racial bias  we cannot accept the Commission's epithets "pretext" and "cover-up." However keen is the Commission's insight into the subtleties of racial discrimination within predominantly white institutions, we cannot permit the Commission to indulge itself within its own judgmental activity the same sinister habit it is the Commission's task to uproot from the judgments of others: that of making unarticulated, speculative, and uncomplimentary assumptions about the purposes, motives, and abilities of persons unseen, unheard, and unknown. For this fault the Commission's order must be vacated.
It does not follow, however, that Hargis' complaint must be dismissed. Though the Commission is not permitted on a neutral record to attribute impermissible discriminatory motives to persons it has neither seen or heard, the Commission in its collective experience and expertise is entitled *108 to make allowance for the fact that "direct evidence of discriminatory intent ... is seldom present," and the Commission may adopt such standards of proof as are necessary to identify traces of racial discrimination either systemic or casual in conduct that superficially is explicable on other grounds.
To some extent in the Commission's order, but more clearly in its brief defending that order, the Commission speaks of its ultimate conclusion  that the School Board unlawfully discriminated against Hargis because of race, Section 23.167(1)(a)  less as the Commission's subjective assessment of the motives of the actors, which on this record we have disapproved, and more as a conclusion based on the School Board's failure to meet Hargis' prima facie case by proving a legitimate nondiscriminatory reason for its action. Invoking the proof standards made applicable to comparable federal legislation[2] by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as recently further elaborated by unpublished orders of the United States District Court for the Northern District of Florida,[3] the Commission's brief reasons that Hargis' prima facie case of racial discrimination  established, says the Commission, by proof of Hargis' qualifications, her race or color, and her exclusion from meaningful consideration for the job  becomes conclusive when the employer's explanation for its action, though nondiscriminatory, is illegitimate by other standards. Hargis was excluded from consideration by an administrative foulup, the Commission says, which the School Board refused to remedy in spite of its known racial impact.
The Commission's order is insufficient to sustain this reasoning for two reasons: first, whether this proof standard is advanced here as a matter of statutory policy or as the Commission's view of the applicable law, it is incompletely expounded in the Commission's order, and we will not transfuse the order with argument from a lawyer's brief; and second, if the Commission order is regarded as adopting such a standard of proof as a matter of nonrule policy, the announced policy must be supported by a record foundation tending to show its efficacy in fact. Because this deficiency may be remediable without retrying the issues that are factual in an episodic sense, they having already been determined, we elect to vacate the Commission's erroneous order and to remand for further proceedings ending in a further order clarifying the Commission's position and defending its assumptions. See Cenac v. Florida State Board of *109 Accountancy, 399 So.2d 1013 (Fla. 1st DCA 1981) and cases cited.
Appropriate standards and burdens of proof in Commission proceedings on racial discrimination charges are susceptible of determination either as a matter of law or as a matter of policy deemed necessary to make the statute effective. See Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).[4] We shall await guidance from the Commission's further order before deciding how those questions will be determined, whether as law, policy, or some admixture.
Our reservation of this issue has obvious ramifications on the further Commission proceedings. If standards and burdens of proof in proceedings such as these should be determined wholly as a matter of law, and the Commission is content simply to incorporate in its order the standards judicially observed in enforcing similar federal legislation, see n. 2 supra, the judicial branch of this State, and this court as its present representative, will determine those standards as a matter of law, with due regard for judicial canons of statutory construction drawing upon the interpretations of similar federal legislation. In that event we shall also decide by conventional judicial methods whether a case of racial discrimination is made out by such proof as is contained in this record. But if after further Commission proceedings it appears that considerations of statutory policy should predominate in fixing proof standards and burdens in these administrative cases, our deference to the agency's view will correspondingly increase, due to "its greater familiarity with the statutory scheme and its expertise in the field regulated." Rice v. Dept. of Health and Rehab. Services, 386 So.2d 844, 850 (Fla. 1st DCA 1980). In that event, however, the Commission's burden in the further proceedings now authorized goes beyond mere string-citing of federal judicial decisions; the Commission must provide both an exposition of the claimed correlation between racial discrimination and the administrative intransigence exhibited here, and a record foundation for that exposition. Cenac, supra; ABC Liquors, Inc. v. Dept. of Business Regulation, 397 So.2d 696 (Fla. 1st DCA 1981); Anheuser-Busch, Inc. v. Dept. of Business Regulation, 393 So.2d 1177 (Fla. 1st DCA 1980); Rice, supra.
The Commission did not err in permitting its Executive Director to achieve named party status by intervention, Section 120.52(10)(b), Fla. Admin. Code R. 9D-8.13(1); nor by considering as evidence, for such limited corroborative value as it had, the hearsay-ladened "determination of cause" document by which the executive director found reasonable cause to believe a violation had occurred. Sections 120.58(1)(a); Pasco County School Board v. PERC, 353 So.2d 108 (Fla. 1st DCA 1977).
Accordingly, the Commission is authorized to conduct further proceedings pursuant to Section 120.57(2), but the Commission is not authorized to adduce further evidence of the events described in the initial order or otherwise to revisit factual determinations already made. Should the Commission decide that this case does not lend itself to the task we have described, the Commission may conclude the matter by dismissing the charge. Upon entry of a new final order jurisdiction will revest in this court, the supplemental record will be filed, and counsel will apply for a briefing schedule.
REVERSED and REMANDED.
MILLS, C.J., and WENTWORTH, J., concur.
NOTES
[1] The Commission is empowered to "hold hearings to determine the facts about instances of discrimination... ." Section 23.166(6), Fla. Stat. (1979). By rule, DOAH conducts the Commission's hearings on petitions for relief from unlawful employment practices unless the Commission chair directs one member or the full Commission to conduct the hearing. Fla. Admin. Code Rule 9D-8.16(2).
[2] Florida's job discrimination statute is patterned on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. The Supreme Court established the burden of proof that must be met by a Title VII plaintiff in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff has the initial burden of establishing a prima facie case by showing 1) that she belongs to a racial minority; 2) that she applied and was qualified for the job for which the employer was seeking applicants; 3) that she was rejected despite qualifications; and 4) that after rejection, the position remained open and the employer continued to seek applicants with plaintiff's qualifications. If the plaintiff meets this initial burden, the burden shifts to the defendant employer to articulate some legitimate, non-discriminatory reason for rejecting the plaintiff. If the defendant carries this burden, the plaintiff must prove by preponderance that the reasons offered by the employer were a pretext for discrimination by showing, for instance, discriminatory intent. The employer may rebut the pretext charge by proof of absence of discriminatory motive. See also Chalk v. Secretary of Labor, U.S. Dept. of Labor, 565 F.2d 764, 766-67 (D.C. Cir.1977), cert. den., 435 U.S. 945, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). When the burden shifts initially after plaintiff establishes a prima facie case, the employer need not prove that it was actually motivated by articulated non-discriminatory reasons or that the hired applicant was more qualified than plaintiff. Texas Dept. of Community Affairs v. Burdine, ___ U.S. ___, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
[3] In Parker v. Willis, Inc. of Carrabelle, Case No. TCA 78-0746, unpublished orders filed August 14, 1980 and January 9, 1981, the district court ruled that the fact that the defendant employer had lost the applications of qualified black applicants was not a legitimate non-discriminatory explanation for its failure to hire them, sufficient to rebut the applicants' prima facie cases. To find otherwise, the court said, would permit employers to thwart congressional intent by deliberate destruction or "as in this case, by inept personnel practices free of discriminatory intent."
[4] Although the cited cases emphasize the degree of judicial deference due to administrative interpretation of statutory language, those decisions and the body of law and comment stemming from them are pertinent also in deciding what deference is due by a reviewing court to an agency's formulation of proof standards in proceedings on the agency's indigenous statute. See generally Note, The Administrative Interpretation of Statutes, 39 Geo.L.J. 244 (1951); Nathanson, Administrative Discretion in the Interpretation of Statutes, 3 Vand.L.Rev. 470 (1950); Comment, Administrative Tribunals  Judicial Review of Administrative Interpretations of Statutory Provisions  Recent Federal Developments, 47 Mich.L.Rev. 675 (1949).