424 So.2d 86 (1982)
GULF COAST HOSPITAL, INC., Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Office of Community Medical Facilities and Fort Myers Community Hospital, Appellees.
No. SS-432.
District Court of Appeal of Florida, First District.
December 16, 1982.
*87 Jean Laramore of Laramore & Aye, Tallahassee, for appellant.
Eric J. Haugdahl, Asst. Gen. Counsel, Tallahassee, E.G. Boone, Venice, Art Forehand and Bruce J. Smith, Tallahassee, for appellees.
E. Philip Blank of Tucker & Blank, P.A., for Florida Osteopathic Medical Ass'n, Inc., amicus curiae.
BOOTH, Judge.
This cause is before us on appeal from a final order of the Department of Health and Rehabilitative Services (HRS) which denied the application of Gulf Coast Hospital (Gulf Coast) for a certificate of need to construct and operate a 116-bed acute care hospital in Fort Myers, Florida. Since the proposed facility would be an osteopathic facility, the application is governed by Section 381.494(2), Florida Statutes (1979), which provides that:
When an application is made for a certificate of need to construct or to expand an osteopathic facility, the need for such facility shall be determined on the basis of the need and availability in the community for osteopathic services and facilities.
There are two issues presented in this appeal: (1) whether the need and availability of osteopathic services and facilities is to be determined independently of existing nonosteopathic facilities; and (2) whether the application in this case supports the need for a 116-bed facility as proposed.
The determination of the first issue depends on the interpretation of "osteopathic facility" as that term is used in Section 381.494(2). The term "facility" in this context is commonly understood to include a hospital.[1] This is the interpretation given by HRS rules which use the term "osteopathic *88 health care facility" and further define "health care facility" to be, among other things not pertinent here, a "hospital."[2]
Florida Statutes contain various references to osteopathic hospitals. For instance, an osteopathic residency and internship program authorized by Sections 459.005 and 459.021, Florida Statutes, is required to be carried out in "osteopathic hospitals."[3] The record also shows that there are some 18 separate, identifiable osteopathic hospitals licensed in Florida,[4] a fact presumably within the knowledge of the Legislature at the time of its enactment of Section 381.494(2), supra.
The term "osteopathic facility," then, would include an osteopathic hospital, a separate medical facility devoted primarily to the practice of osteopathy.
A question could be raised as to whether something less than an entire or separate hospital would also constitute an "osteopathic facility." We note that Section 381.494(2) does not require that the osteopathic facilities considered in determining need be separate or "free-standing." Presumably some portion of an existing facility devoted to the practice of osteopathy would come within the statutory definition and would be a factor considered in determining need for expansion or construction of other osteopathic facilities in the area. In the instant case, however, neither party relies on such an interpretation of the statute. Further, no evidence was presented that any part of existing medical facilities in the area constituted an "osteopathic facility," by any definition.
In these proceedings, HRS has not sought to define or interpret the term "osteopathic facilities," but rather to present evidence and arguments which would tend to disclaim the need for such facilities.[5]
The Legislature, with the enactment of Section 381.494(2) and other statutes previously *89 referred to, has determined the public policy of this state with regard to the need for identifiable osteopathic facilities.[6] This issue must be considered as settled by the Legislature and is not one for the agency or for this court to redetermine.
The record established that osteopathy[7] and allopathy[8] are two primary and separate schools of medicine which differ substantially in philosophy and practice, a difference which has been and continues to be "extremely divisive."[9] For a hundred *90 years, osteopathy has afforded a choice to patients, a minority group of some ten percent of the population of the United States, who prefer to be treated by osteopathic physicians. Osteopathic facilities may not differ significantly as to physical plant and equipment but are highly distinctive because of the purpose for which they are constructed and maintained. That purpose includes the care and treatment of patients in accordance with the principles of osteopathy, the teaching and the study of osteopathic medicine, and the association in practice of doctors of osteopathy, including osteopathic specialists, with support from staff personnel suitably trained in the principles and philosophy of osteopathy. The management and control of the facility so as to actively further all of the above activities rather than to merely tolerate them, must be in the hands of osteopaths or those sympathetic to that school of medicine. In the absence of separate consideration of need and availability under Section 381.494(2), the valuable contribution of osteopathy and the freedom of choice to patients made available through this distinctive school of medicine will be jeopardized.
The appellant here proved the criteria necessary for issuance of a certificate of need and, in addition, proved present discrimination against osteopaths and their patients in existing medical facilities.[10] Despite the plain meaning of Section 381.494(2), Florida Statutes, however, the hearing officer adopted the position of HRS[11] and ruled that need and availability for osteopathic facilities is not established within the meaning of Section 381.494(2) where non-osteopathic hospitals already in the area are overbedded and staff privileges are, or will be, available to osteopaths in these already existing facilities.[12]
*91 The hearing officer also adopted the contention of HRS that need for osteopathic facilities should not be considered separately from other, non-osteopathic facilities because to do so "would authorize the construction of an osteopathic hospital in every community in which one did not presently exist."
To state this last contention is to reveal its total lack of merit. Certificates of need for osteopathic hospitals are subject to the same myriad of requirements, including financial feasibility, which pertain to other facilities licensed by HRS. Further, the record does not support the dire predictions of HRS that a plain meaning construction of the statute would authorize the construction of an osteopathic hospital in every community. On the contrary, although HRS has, in the past, treated applications for expansion and purchase of new equipment for existing osteopathic hospitals under Section 381.494(2) separately, as required by the express terms of the statute, there is no showing of a great influx of applications for expansion or construction of osteopathic facilities has occurred.[13] Even were it otherwise and the agency's predictions of an osteopathic explosion correct, HRS would not be empowered to rewrite and administratively repeal the legislation in question. Arguments concerning the potential effect of the legislation or questioning the wisdom of such legislation are matters which should be presented to the Legislature itself.
We next consider the hearing officer's conclusion that, where non-osteopathic hospitals in the area have more beds for patients than patients, an osteopathic facility would not be certified unless discrimination against osteopaths prevented access to such facilities.
The hearing officer, in the recommended order adopted by the agency, determined that there was discrimination against osteopaths.[14] The order finds that at the time of the hearing two of the four existing allopathic hospitals had bylaws which prohibited osteopathic physicians from using those facilities; that, at the time of the filing of the application in this case, only one osteopathic physician, Dr. Centafont, had been admitted to practice in any of the four existing hospitals; and that several other osteopaths were admitted to consulting privileges only after the letter of intent to construct the osteopathic hospital in these proceedings had been filed. The hearing officer's order concludes, however, that, in view of the professed willingness of two of four hospitals (Lehigh Acres General Hospital and Fort Myers Community Hospital) to consider the applications of osteopaths and the anticipated effect of Section 395.0653, Florida Statutes,[15] the so-called "anti-discrimination *92 statute," facilities would be available in the future for osteopaths, and the certificate of need should be denied.
Proof of discrimination is not required under Section 381.494(2). This is not to say, however, that the hearing officer is required to ignore evidence of discrimination, evidence which, in the instant case, exacerbates the need for the osteopathic facility in question. Thus, although there was considerable evidence of discrimination, as found by the hearing officer, this showing was not a required part of the applicant's burden under Section 381.494(2).
Nor is the anticipated effect of Section 395.065(3)[16] to eradicate discriminatory practices in hospital staffing procedures a basis for the denial of a certificate of need for an osteopathic facility. The potential availability of staff privileges for osteopaths in allopathic hospitals, even if it becomes something more than a "token," is not a substitute for the practice of osteopathy in an osteopathic hospital. The Legislature, in the enactment of Sections 381.494(2) (certification proceedings for osteopathic facilities) and 395.065(3) (staff privileges for osteopaths in existing facilities), has clearly spoken in recognition of both these interests.
We also reject the contention of HRS that, since the proposed hospital will afford staff privileges to non-osteopaths the facility cannot be classified as "osteopathic." An osteopathic hospital must comply with the anti-discrimination statute affording opportunity to staff privileges to non-osteopaths. The staff need not be 100 percent osteopathic. The nature of the facility is controlled by the purpose for which the facility is maintained and operated.
*93 The application here establishes that the proposed facility will be devoted primarily to the practice of osteopathic medicine and that it includes a provision for residency and internship programs for osteopaths, programs not shown to be available in any other facility in the area.[17]
In summary, Section 381.494(2), Florida Statutes, requires that the needs of osteopaths and their patients for osteopathic facilities be recognized as a factor in the certification process. Potential or actual access to allopathic facilities by osteopaths, discrimination against osteopaths or the lack thereof are not factors referred to expressly or by implication in Section 381.494(2). Had the Legislature intended that these considerations enter in the agency's determination of need, it quite simply would have said so. Had the intent been to evaluate need and availability of osteopathic facilities in terms of all existing medical facilities, Section 381.494(2) would not have been enacted.
We conclude, therefore, that the order below misinterpreted Section 381.494(2) and that the certificate of need for the osteopathic facility should have been granted.
The other issue on appeal is the sufficiency of the evidence adduced by the applicant to substantiate its need for a 116-bed facility in the Fort Myers service area. On appeal, appellee correctly contends that insufficient statistical evidence was adduced to establish the need for 116 beds. Lack of historical data on the number of patients admitted to hospitals in the area by osteopaths may be attributed to the history of discrimination and to the failure of area hospitals to admit but one of the osteopaths to staff, thus requiring the patients of osteopaths to be admitted to hospitals and treated while in the hospital by staff physicians.[18]
Accordingly, the cause is remanded pursuant to Section 381.494(7)(c), Florida Statutes, with directions that HRS authorize such sized facility as the evidence already adduced or further evidence which may be adduced establishes.
In view of our holding on the primary issues in this case, it is unnecessary to determine issues relating to the failure of the hearing officer to rule on a number of proposed findings of fact, Stuckey's of Eastman, Georgia v. Department of Transportation, 340 So.2d 119 (Fla. 1st DCA 1976), and the application of the rule in Miller v. Agrico Chemical Company, 383 So.2d 1137 (Fla. 1st DCA 1980), as pertains to the agency's prior, inconsistent interpretations of Section 381.494(2), Florida Statutes.
We have considered Gulf Coast's request that we authorize the granting of costs and attorney fees under the doctrine of Jess Parrish Memorial Hospital v. Florida Public Employees Relations Commission, 364 So.2d 777 (Fla. 1st DCA 1978), and that request is denied.
Accordingly, the order below is reversed and the cause remanded for further proceedings consistent herewith.
SHAW, J., concurs.
ROBERT P. SMITH, Jr., C.J., specially concurs with written opinion.
ROBERT P. SMITH, Jr., Chief Judge, specially concurring:
The interpretation given section 381.494(2), Florida Statutes (1979), by the Department *94 of Health and Rehabilitative Services was one reasonably permitted by the health planning statutes it administers. HRS legitimated that non-rule interpretation by building a record foundation of evidence to support its sound policy reasons for that choice of meaning, fully satisfying APA disciplines on agency policy-making within statutory bounds. Ordinarily, therefore, I would unhesitatingly affirm the department's resulting order. However, I am persuaded to concur in the result in this case because the 1982 legislature exercised its undoubted power to veto the department's position by changing the substantive law on which it rested.
Gulf Coast proposes to build a 116-bed "osteopathic" hospital in Lee County at a cost projected in 1978 to be $12.8 million. Its application for a certificate of need for this project, required by section 381.494, Florida Statutes, was rejected both by the regional health systems agency, making the initial recommendation under section 381.494(6),[1] and by the department on reviewing the recommendation under section 381.494(7)(c). Those agencies concluded that there is no need for this hospital because similar services are available in existing inpatient facilities and because there are less costly and more appropriate alternatives to the project, two of the many statutory criteria to be considered by the health systems agency and the department in determining whether to issue a certificate of need.[2]
At the section 120.57 hearing challenging this decision, Gulf Coast took the position that those general statutory criteria for issuing a certificate of need did not apply to its application to build an "osteopathic facility."[3] *95 It contended that, since section 381.494(2) requires the department to determine "the need and availability in the community for osteopathic services and facilities," the only pertinent consideration is whether the area contains a subpopulation of osteopaths who are without "their own" hospital to which to send patients. If that is the case, the osteopaths said, the department must authorize a new osteopathic hospital without regard for the number of unused beds in existing hospitals characterized as non-osteopathic.
HRS adduced proof that there are few, if any, significant physical differences between "osteopathic" and "non-osteopathic" hospitals.[4] The record also establishes that in 1983 the four non-osteopathic hospitals operating in Lee County  all managed by M.D. physicians  will have 265 "excess" hospital beds.[5] In light of the surplus of beds suitable for osteopathic hospital care, HRS found that Gulf Coast could not satisfy general certificate of need criteria. However, it construed section 381.494(2) as allowing osteopaths their own facility if by reason of discrimination they have no access to an existing non-osteopathic hospital. But, HRS maintained, if osteopaths have access to an existing hospital however denominated, the public has no need to build or buy, with health care dollars, a separate osteopathic hospital. Thus finding that osteopaths are reliably assured of nondiscriminatory access to one or more existing Lee County hospitals, HRS found no need for another new hospital under section 381.494(2).
This view of the statute, adopted in the recommended and final order, is a thoroughly sensible interpretation by the agency charged by the legislature with the formulation of health planning policies within general statutory bounds. As the state health planning agency, HRS is designated the "provider of information, consultant, stimulator, and advisor to all health care institutions, health service providers, hospices and consumers" participating in the required process of deciding when new health services are needed. The legislature has commanded the department and health systems agencies to give "[e]very consideration ... to the elimination of unnecessary duplication of health services." Even if a health systems agency finds a need for a new service, it is directed "to consider available alternatives to meet the needs." (emphasis supplied) Section 381.493(2), Fla. *96 Stat. (1979). When considering an application to construct or expand inpatient facilities, such as hospitals particularly, the health systems agencies and HRS must make specific findings of whether the proposed new project would duplicate existing facilities.[6]
And so of course unused beds in existing hospitals are pertinent to the "need" for a new hospital; of course it is pertinent that osteopaths have access to those beds, or do not. Seen in this light, the task before the department, and now before us in reviewing the department's work, is not simply a dry exercise of abstracting from section 381.494(2) one exclusive meaning, as a matter of law, for the words "osteopathic services and facilities." In construing these words, the department was necessarily engaged in formulating "policy within the agency's exercise of delegated discretion." Section 120.68(7), Fla. Stat. Recognizing that, the judiciary must defer to the constitutional role of the executive branch and to the interpretative authority of its agencies. E.g., School Board of Leon County v. Hargis, 400 So.2d 103, 109 (Fla. 1st DCA 1981); Cenac v. Florida State Board of Accountancy, 399 So.2d 1013, 1018 (Fla. 1st DCA 1981); Smith v. School Board of Leon County, 405 So.2d 183, 185 (Fla. 1st DCA 1981); Hartnett v. Department of Insurance, 406 So.2d 1180, 1184 (Fla. 1st DCA 1981); Ortega v. Owens-Corning Fiberglas Corp., 409 So.2d 530, 532 (Fla. 1st DCA 1982).
So, too, if the question is phrased as one of statutory interpretation, the agency's interpretation must prevail where, as here, the agency has built a record foundation of proof from its own experts and others supporting the cost-containment rationale for its non-rule interpretation. Florida Cities Water Co. v. Florida Public Service Commission, 384 So.2d 1280, 1281 (Fla. 1980); Anheuser-Busch, Inc. v. Department of Business Regulation, 393 So.2d 1177, 1182-83 (Fla. 1st DCA 1981). The contemporaneous construction of a statute by the executive officials who administer it should be rejected only if clearly erroneous. King v. Seamon, 59 So.2d 859 (Fla. 1952); ABC Liquors, Inc. v. Department of Business Regulation, 397 So.2d 696, 697 (Fla. 1st DCA 1981).
Despite any prior department history of having maintained separate certificating systems for osteopathic hospitals and other kinds, the department was surely entitled to recognize the need for a different view of the statute when the legislature in 1979 explicitly prohibited hospitals from denying privileges to osteopaths solely because they follow a different school of medicine. Section 395.0653(1), Fla. Stat. (1979);[7]Sarasota *97 County Public Hospital Board v. Shahawy, 408 So.2d 644, 646 n. 1 (Fla. 2d DCA 1981). See also Hackett v. Metropolitan General Hospital, 422 So.2d 986 (Fla. 2d DCA 1982) (osteopathic hospital denying privileges to M.D.). HRS surely was entitled to decide that section 381.494(2) should not be employed to perpetuate old discriminatory practices now prohibited, practices fostered by duplicating separately staffed hospitals so that both doctors of medicine and doctors of osteopathy may have "their own."
Absent any further legislative direction, I would conclude that the majority has failed to give due credence to the agency's authority, and to the administrative process that was legislatively created and judicially refined with some care, to assure that agencies act deliberately, responsibly and with regard for competing interests. HRS most certainly observed APA disciplines in entering its October 1979 order.
However, on decisions of statutory purpose and agency policy the legislature always holds a trump, which is to amend the substantive statute. That is precisely what the 1982 legislature did, April 21, 1982, while this appeal was pending. Section 395.011(6), Florida Statutes (1982 Supp.), effective October 1, 1982,[8] now provides:
Nothing herein shall be construed by the department [HRS] as requiring an applicant for a certificate of need to establish proof of discrimination in the granting of or denial of hospital staff membership or professional clinical privileges as a precondition to obtaining such certificate of need under the provisions of s. 381.494(2).
Since the HRS order on appeal essentially requires proof of discrimination against osteopaths by an existing hospital before a separate osteopathic hospital will be authorized under section 381.494(2), this new legislation quite obviously changes the predicate of the department's position as expressed in its final order filed October 31, 1979. The legislature presumably acted in direct response to the department's order, previously published in 1 FALR A-1368. Unlike the majority, I think the department's process was entirely appropriate and the action taken was well within the department's prerogatives when taken; but the legislature has simply exercised its trumping prerogative to change significantly the law governing the issuance of this license.
In these circumstances, Gulf Coast is entitled to a final decision in accord with the law now in effect, and no purpose would be served by returning the case to the department for further consideration.
I therefore agree that the order must be reversed and remanded for the department's consideration and determination of the size of the facility Gulf Coast is to be authorized to build.
NOTES
[1] Webster's Third New International Dictionary, Unabridged, at 812:

Facility ... something (as a hospital ...) that is built, constructed, installed or established to perform some particular function or to serve or facilitate some particular need.
[2] Fla. Admin. Code Rule 10-5.10(11):

When an application is made for a certificate of need to construct or expand an osteopathic health care facility, the need for such facility shall be determined on the basis of the need and availability in the community of osteopathic services and facilities. (emphasis added)
Rule 10-5.02(8):
Health care facility includes hospitals, skilled nursing homes, intermediate care nursing homes, intermediate care facilities for the mentally retarded, ambulatory surgical centers, and chronic renal dialysis centers. (emphasis added)
Sections 394.455(10) and (14), Florida Statutes, define "facility" and "private facility," respectively, to mean a hospital. Further definitions of "hospital" are found in Section 395.01(1) and 394.455(1).
[3] Subsections 1, 3 and 5 of Section 459.021, Florida Statutes, provided that:

(1) Any person who holds a degree of Doctor of Osteopathy from a college of osteopathic medicine recognized and approved by the American Osteopathic Association who desires to serve as a resident or as an intern in an osteopathic hospital shall apply to the Department for a certificate of registration. Upon certification by the Board that the applicant holds a valid degree and that the hospital where he intends to serve is approved by the Bureau of Hospitals of the American Osteopathic Association, the Department shall issue the certificate. (emphasis added)
(3) Every osteopathic hospital having a resident or intern training program shall furnish in January and July of each year to the Department a list of all residents and interns who have served in the hospital during the preceding six-month period. (emphasis added)
(5) It is hereby constituted a misdemeanor ... for any osteopathic hospital ...:
(a) To employ the services in the hospital of any person as an intern or as a resident, unless such person is the holder of a valid certificate under the law or the holder of a license to practice osteopathic medicine under this chapter.
[4] Since 1961, there have been 18 osteopathic hospitals in Florida, a number which has remained unchanged at least through 1981. 1 Lawyer's Medical Cyclopedia § 1.19 (1966); 1 Lawyer's Medical Cyclopedia § 1.19 (3d Ed. 1981). A list of licensed hospitals for 1978-79 published by the Department of HRS Office of Licensure and Certification, shows 18 osteopathic hospitals in this state, located in the eight most populous counties. There is no osteopathic facility presently in Planning District 6 (Polk, Hardee, Desota, Highlands, Sarasota, Charlotte, Glades, Hendry, Lee and Collier Counties), which includes the immediate area to be served by the proposed hospital.
[5] For instance, HRS contends that there is only one type of certificate of need and only one license, which is for all acute care facilities or hospitals. However, it is undeniable that the certification proceeding encompasses a number of "types of hospitals." See § 395.07, Fla. Stat. Further, the statute here in question, § 381.494(2), states at the outset that it applies "when an application is made for a certificate of need to construct or to expand an osteopathic facility." In the instant case, the application begins with this qualification, thereby bringing into play the specific requirements of § 381.494(2).
[6] The record establishes that Florida is one of eight states which has adopted a statute requiring separate consideration of osteopathic facilities when determining need and availability of medical facilities in an area. Testimony at the hearing below described legislation then pending in the United States Congress at the time of the hearing which would require separate consideration of the facilities needed for osteopathic and allopathic medicine. That legislation has subsequently been adopted and will apply to states seeking federal funds for medical facilities. 42 U.S.C. § 300m-6(f).
[7] § 459.002(3), Fla. Stat.:

"Practice of osteopathic medicine" means the diagnosis, treatment, operation or prescription for any human disease, pain, injury, deformity or other physical or mental condition, which practice is based in part upon educational standards and requirements which emphasize the importance of the musculoskeletal structure and manipulative therapy in the maintenance and restoration of health.
Osteopathic physicians are licensed under Ch. 459.
[8] Allopathy is defined in Webster's Third New International Dictionary as "a system of medical practice that aims to combat disease by use of remedies producing effects different from those produced by the special disease treated."

Doctors of medicine are licensed under Ch. 458, Fla. Stat.
[9] The record is replete with instances of discrimination against osteopaths and extreme diversity between osteopaths and allopaths existing at the time the letter of intent was filed August 1, 1978, and continuing at the time of the hearings, April-July, 1979. A few examples follow:

James Steven, the Administrator of Lehigh Acres General Hospital, when asked if Dr. Lipman, an osteopath, was rejected by Lehigh Acres on September 5, 1978 for staff privileges because he was an osteopath, testified:
That was never said, but I believe that was probably correct. I think it is probably generally conceded in this hearing that the issue of allopathic and osteopathic physicians is an extremely divisive one in this part of the country and perhaps in other parts of the country. (emphasis added)
Dr. Laboda, one of the founders of Fort Myers Community Hospital and an allopathic physician, was asked:
Q Why did you wait to act on it [application for staff by Dr. Picola, osteopath, initially filed in 1974 and not acted on until September of 1978, after the certificate of need application was filed in this case] until you did?
A Because of our fear of alienating the medical staff... . This has been a very difficult problem in the medical community here in Lee County and we need the support of our medical staff to run the hospital. And we are not in a position, particularly as a new hospital ..., to alienate a large majority of our medical staff.
Testifying further regarding disparaging remarks made in existing hospitals about osteopaths and the difficulty of controlling the attitude of employees in those institutions who make these remarks in the presence of patients, Dr. Laboda stated:
But it is difficult, well difficult is not the word, but it has been an impossible situation in the other hospitals (Cape Coral and Lee Memorial) as well as in this department as to open staff. There have been heated feelings. The medical staff at Cape Coral have a very heated feeling about it and it wouldn't surprise me if those remarks [derogatory remarks about osteopaths] were made in the emergency room. (emphasis added)
Dr. Centafont, who is the only osteopathic physician accorded active staff privileges at any of the four allopathic hospitals in Lee County, testified as to his difficulty in obtaining sponsorship:
A ... I was first admitted to the staff  I received my letter of notification in August of '77, but I was not able to admit any patients to the hospital until November of 1977.
Q Why was there such a long lapse between your official appointment and being able to admit patients?
A It was great difficulty in being able to obtain sponsors, people who would be sponsors for me in the hospital.
Q What are sponsors?
A Sponsors usually are physicians on the staff who oversee the work of the new physician and help to guide him in the hospital procedures and to see if he is indeed carrying on his work in a competent manner.
Q Okay. What was the difficulty in your obtaining the sponsors?
A No one would volunteer.
Q Is that the usual procedure?
A Apparently in Lehigh Acres that was the usual procedure that sponsors usually volunteered. It got to the point where no one was volunteering and so I had to go out and solicit physicians myself to act as my sponsors.
Q And what type physicians finally consented to be your sponsors?
A A pathologist, a urologist and a radiologist.
Q Was that particularly helpful in your practice or, was that within the scope of your practice?
A Well they are not family practitioners as I am, and I had to take what was available.
Regarding the present attitude of the staff at Lehigh towards Dr. Centafont, the doctor was questioned as follows:
Q What is the attitude of the staff towards you? Are they friendly and cooperative or do they treat you in any way different than your allopathic colleague, or their allopathic colleagues?
A There is a difference in their attitude.
Q That's what I mean.
A There is a, quite a free interchange between all of the allopathic physicians and, there is a coolness in attitude towards me.
[10] The applicant in the instant case has proved, inter alia, discrimination and lack of sympathetic treatment received by osteopathic physicians and patients in existing hospitals and that there are, conservatively, more than 23,000 osteopathic patients in the immediate service area as well as at least seven practicing osteopathic physicians in Lee County who need the proposed hospital. The record also shows that there are no existing facilities in Lee County meeting the definition of an osteopathic facility.
[11] HRS and the intervenor have shown that two of four non-osteopathic facilities have recently made available opportunities to oestopaths to be admitted to staff privileges. HRS has not shown that the concessions made, and promised to be made, by existing facilities constitute the equivalent of an "osteopathic facility." The contention is rather that, despite the statute, there should be no distinction between the two schools of medicine and no distinction between hospitals devoted to either school of medicine and that osteopaths should be required to use the existing non-osteopathic facilities so long as there are extra patient beds available in those facilities.
[12] undersigned Hearing Officer concludes that the respondent's [HRS] interpretation of § 381.494(2) is the correct one. Where an area is already overbedded, an applicant for a new 116-bed osteopathic hospital must demonstrate that osteopathic services and facilities are not otherwise available in the community. To adopt the petitioner's construction of the statute would be contrary to the purpose and intent of the certificate of need law, and would authorize the construction of an osteopathic hospital in every community in which one did not presently exist.
....
The proper issue is whether other facilities in the area are available to osteopathic physicians. The evidence establishes that they are and this fact cannot be erased or negated by the unwillingness of the D.O.'s to avail themselves of the use of such facilities. (emphasis added)
[13] On the contrary, the testimony of Art Forehand, Administrator of the Office of Community Medical Facilities, Department of HRS, is that this is the first application for the construction of a new osteopathic hospital he has seen under § 381.494(2), Fla. Stat., effective October 1, 1975.
[14] This finding is more than amply supported by the record. Merely a few examples of discrimination are cited in Footnote 7, supra.
[15] § 395.0653, Fla. Stat., provides, in pertinent part, that:

(1) Any hospital licensed under this chapter in considering and acting upon applications for staff membership or professional clinical privileges shall not deny the application of a qualified doctor of medicine licensed under Chapter 458, doctor of osteopathy licensed under chapter 459, doctor of dentistry licensed under chapter 466, or doctor of podiatry licensed under chapter 461 for such staff membership or professional clinical privileges within the scope of his respective licensure solely because the applicant is licensed under any of said chapters.
(2) Nothing herein shall restrict in any way the authority of the medical staff of the hospital to review for approval or disapproval all applications for appointment and annual reappointment to all categories of staff and make recommendations on each to the governing authority, including delineation of privileges to be granted in each case. In making such recommendations and in delineation of privileges, each applicant shall be considered on an individual basis pursuant to criteria applied equally to all other disciplines.
[16] It is hoped that § 395.0653, Fla. Stat., will improve relations between the two schools of medicine, a hope which is not supported by the past history of such legislation, unfortunately. For instance, in Munroe v. Waugh, 66 N.M. 15, 340 P.2d 1069, 1071 (1959), the court held that:

Based upon the history of the osteopathic statutes, a fair analysis of the statute in question would be that the first paragraphs there of place osteopaths on equal footing with medical doctors, but that a third paragraph reserves to the governing boards of public hospitals full control over the making of regulations to determine who should be on staff, irrespective of the so-called rights given to osteopaths.
The court in the Munroe v. Waugh case, supra, cited with approval the decision of the Florida Supreme Court in Richardson v. City of Miami, 144 Fla. 294, 198 So. 51, 56 (1940), wherein the court held that a municipal hospital could by regulation expressly preclude osteopaths from practice despite the revisions of Fla. Stat.Acts 1927, Ch. 12287, § 13:
Osteopathic physicians and surgeons licensed hereunder shall have the same rights as physicians and surgeons of other schools of medicine with respect to the treatment of cases and the holding of offices in public institutions.
See also, "Exclusion of or Discrimination Against Physician or Surgeon by Hospital Authorities," 24 A.L.R.2d 850, and "Exclusion of or Discrimination Against Physician or Surgeon by Hospital," 37 A.L.R.3d 645.
Initially, it must be noted that § 395.0653, Fla. Stat., does not ensure to any degree that an applicant will be admitted to staff privileges in a hospital. The only requirement is that the hospital, "[i]n considering and acting upon" applications, not deny the application because of the particular school of medicine of the applicant. The second paragraph of that statute ensures continued control by the hospital staff over approval and disapproval of applications. Such statutes have in the past proved extremely difficult to enforce by an individual applicant. As summarized in Vol. 1 of Lawyer's Medical Cyclopedia § 1.19:
Statutes exist in a number of states which in substance provide: "No preference shall ever be given to any school of medicine" or "in the management of any public hospital, no discrimination shall be made of any school of medicine recognized by the laws of the state, and all such legal practitioners shall have equal privileges in the treating of patients in such hospitals."
In view of the differing opinions of the Supreme Court interpreting nondiscrimination statutes, all that may be said with safety is that a majority of the courts which have considered such statutes have concluded that such language does not require the admission of osteopaths to medical staff privileges.
[17] Gulf Coast's application and testimony presented showed that it is Gulf Coast's intent to be established as, and that there is a need for, a teaching institution for osteopathic medicine. The 1979 version of § 381.496(6)(c)6 provided that, when evaluating a certificate of need, consideration should be given to, among other things, "the need for research and educational facilities." The current version of the statute defines that consideration as "[t]he need for research and educational facilities, including, but not limited to, institutional training programs for doctors of osteopathy and medicine at the student, internship and residency training levels." HRS presented no testimony that the need for educational facilities for osteopaths can be or are being met in any of the four non-osteopathic facilities.
[18] Change in the numbers of proponents of the application also affected the projected patient count relied on by expert witnesses.
[1] Section 381.494(6), Fla. Stat. (1979), provides in part:

(6) FUNCTION OF HEALTH SYSTEMS AGENCY. 
(a) The health systems agency, upon commencement of the review period on a proposal, shall make such investigations and inquiries as necessary to enable it to make a recommendation to the department for approval or denial of a certificate of need.
The regional health systems agencies are comprehensive health planning councils made up of both consumers and providers of health services. Section 381.393(3)(h), Fla. Stat. (1979).
[2] Section 381.494(6)(c), Fla. Stat. (1979), requires consideration of the following criteria:

1. The need for health care facilities and services and hospices being proposed in relation to the applicable health systems plan, annual implementation plan, and state medical facilities plan adopted pursuant to Titles XV and XVI of the Public Health Service Act.
2. The availability, accessibility, extent of utilization, and adequacy of like and existing health care services and hospices in the applicant's health service area.
3. The availability and adequacy of other health care facilities and services and hospices in the applicant's health service area, such as outpatient care and ambulatory or home care services, which may serve as alternatives for the health care facilities and services to be provided by the applicant.
4. Probable economies and improvements in service that may be derived from operation of joint, cooperative, or shared health care resources.
5. The need in the applicant's health service area for special equipment and services which are not reasonably and economically accessible in adjoining areas.
6. The need for research and educational facilities.
7. The availability of resources, including health manpower, management personnel, and funds for capital and operating expenditures, for project accomplishments and operation.
8. The immediate and long-term financial feasibility of the proposal.
9. The special needs and circumstances of health maintenance organizations for which assistance may be provided under Title XIII of the Public Health Service Act.
10. The needs and circumstances of those entities which provide a substantial portion of their services or resources, or both, to individuals not residing in the health service area in which the entities are located or in adjacent health service areas. Such entities may include medical and other health professions, schools, multidisciplinary clinics, and specialty services such as open heart surgery, radiation therapy, and renal transplantation.
11. The probable impact of the proposed construction project on the costs of providing health services by the applicant.
12. The costs and methods of the proposed construction, including the costs and methods of energy provision and the availability of alternative, less costly, or more effective, methods of construction.
See also Rule 10-5.11(1)-(12), Fla. Admin. Code.
[3] Although the question of whether an osteopathic "facility" may consist of something less than a free-standing hospital may not have been fully articulated on appeal, appellee Fort Myers Community Hospital's attorney clearly took the position below that a manipulative medicine department for osteopaths within an existing non-osteopathic hospital would be a reasonable alternative to a completely new $12.8-million building.
[4] The differences, as articulated in the hearing officer's recommended order fully supported by substantial competent evidence, were as follows:

The only real difference in the physical plants of allopathic [non-osteopathic] and osteopathic hospitals are the treatment rooms for manipulative medicine. Many D.O.'s do not practice manipulative medicine and only ten to fifteen percent of those who do require a hospital setting. There is some small difference in the medical charts used by D.O.'s with regard to a space for the structural examination. Otherwise, there is no substantial difference in the day-to-day function or operation of an osteopathic hospital.
The administrator of Fort Myers Community Hospital testified that he would purchase any equipment requested by osteopaths for manipulative treatment, at a possible cost ranging from several hundred to several thousand dollars.
[5] The federal health planning regulations note:

There is general agreement that the number of general hospital beds in the United States is significantly in excess of what is needed and that utilization of acute in-patient care resources is often higher than necessary. Excess bed capacity and use contribute to the high cost of hospital care with little or no health benefits. Empty beds are often filled by patients who could be cared for as well or better in less expensive ways, such as ambulatory care or home care. 42 CFR § 121.201(b)(1981)
Representatives of the existing Fort Myers hospitals testified that they would have to raise their rates if Gulf Coast built a new hospital further decreasing use of their extra beds.
[6] "In cases of capital expenditure proposals for the provision of new health services to inpatients," a health systems agency must justify the project on the following additional grounds under section 381.494(6)(e), Fla. Stat. (1979):

1. That less costly, more efficient, or more appropriate alternatives to such inpatient services are not available and the development of such alternatives has been studied and found not practicable.
2. That existing inpatient facilities providing inpatient services similar to those proposed are being used in an appropriate and efficient manner.
3. That, in the case of new construction, alternatives to new construction, e.g., modernization or sharing arrangements, have been considered and have been implemented to the maximum extent practicable.
4. That patients will experience serious problems in obtaining inpatient care of the type proposed, in the absence of the proposed new service.
5. That, in the case of a proposal for the addition of beds for the provision of skilled nursing or intermediate care services, the addition will be consistent with the plans of other agencies of the state responsible for the provision and financing of long-term care, including home health services.
The department may not issue the certificate unless those additional findings are documented in writing. Section 381.494(7)(c), Fla. Stat. (1979).
[7] The 1982 legislature amended section 395.0653, Fla. Stat., to prevent hospitals from using a more subtle form of discrimination against osteopaths by limiting staff privileges to those who have participated in residency programs established by the American Medical Association, typically M.D.s. Section 395.011(2), Fla. Stat. (1982 Supp.), the renumbered antidiscrimination statute, provides that a hospital may not require an AMA-sponsored graduate education as a precondition to obtaining staff privileges unless it also makes such privileges available to those who have completed similar programs sponsored by the American Osteopathic Association. Section 395.011(3) spells out criteria to be used in determining whether to grant privileges in an individual case. For discussion of the need for these changes in the anti-discrimination statute, see Staff of the Florida House of Representatives Committee on Regulatory Reform, Sunset Review of Chapter 395, Part I, Florida Statutes, General Provisions of Hospital Licensing and Regulation, 47-48, 69-70 (1982).
[8] Ch. 82-182 §§ 26, 31, Laws of Fla.