## HCA HEALTH SERVICES OF FLORIDA, INC. v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 84-1847R

## AMERICAN HEALTHCORP OF VERO BEACH, INC. v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 84-1848R

## AMERICAN MEDICAL INTERNATIONAL, INC. and SOUTHEASTERN MEDICAL CENTER v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 84-1849R

## MARTIN MEMORIAL HOSPITAL ASSOCIATION, INC., v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 84-1850R

## MANASOTA OSTEOPATHIC GENERAL HOSPITAL, INC. v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 84-1858R

State of Florida, Division of Administrative Hearings
January 15, 1985

## APPEARANCES OF COUNSEL

**Donna H. Stinson** for petitioner, HCA Health Services of Florida, Inc.

**Michael J. Cherniga** and **Stephen A. Ecenia** for petitioner, American Healthcorp of Vero Beach.

**Robert S. Cohen** for petitioners, AMI and Southeastern Medical Center.

**Byron Matthews** for petitioner, Martin Memorial Hospital Association.

**F. Philip Blank** for petitioner, Manasota Osteopathic General Hospital.

**Kenneth F. Hoffman** for intervenor, Boca Raton Community Hospital.

**Stephen M. Corse** for intervenor, Doctors Hospital of Plantation.

**Michael Glazer** for intervenor, NME Hospitals, Inc.

**James M. Barclay** and **John M. Carlson** for respondent, Department of Health and Rehabilitative Services.

## OPINION

DIANE D. TREMOR, Hearing Officer.

Pursuant to notice, an administrative hearing was held before Diane D. Tremor, Hearing Officer with the Division of Administrative Hearings, commencing on June 25, 1984, and continuing on August 13, 1984, in Tallahassee, Florida. The issue for determination in this proceeding is whether respondent's proposed Rule 10-5.11(28), relating to osteopathic acute care bed need, constitutes an invalid exercise of delegated legislative authority.

## *INTRODUCTION*

Each of the five petitioners listed in the caption timely filed petitions pursuant to Section 120.54(4), Florida Statutes, challenging the validity of Rule 10-5.11(28) proposed by the Department of Health and Rehabilitative Services (HRS). Boca Raton Community Hospital, Doctors Hospital, Inc. of Plantation and NME Hospitals, Inc. were each granted leave to intervene in opposition to the proposed rule. Each of the petitioners and intervenors challenge the validity of proposed Rule 10-5.11(28) on both procedural and substantive grounds, though it appears from the posthearing submittals that the only portion of the rule being challenged by Manasota Osteopathic General Hospital, Inc.

**125**

is the "grandfather" provision contained in proposed Rule 10-5.11(28)(a)2.

Called as witnesses by the petitioners and intervenors were Eugene Nelson, the Administrator of the HRS Office of Community Medical Facilities; Christopher Coffee, the Directory of Planning for Martin Memorial Hospital; Gary Nordmark, Vice President of Boca Raton Community Hospital; John Anderson, Robert E. Stone, Michael Douglas Jernigan and Judith Horowitz, each of whom was accepted as an expert witness in the area of health planning; Robert G. Turner, accepted as an expert witness in the area of economics; Stephen R. Winn, a Director of Manasota Osteopathic General Hospital; and James Bare, the Associate Director of Planning for NME Hospitals. Received into evidence were the depositions of Betty Roberts, who was responsible for preparing the Economic Impact Statement for the proposed rule, Bob Maryansky, the Director of HRS's Office of Licensure and Certification; Phillip C. Rond, the Administrator of HRS's Office of Health Planning; Larry I. Gilderman, an osteopathic physician; and David McClellan, an Associate Executive Director of Humana Hospital of the Palm Beaches. The following exhibits were received into evidence at the hearing: Hearing Officer's Exhibit 1, HCA's Exhibits 1 through 6, Martin Memorial's Exhibits 1 through 11, Doctor's Hospital Exhibit 1, Boca Raton Community Exhibit 1, NME's Exhibit 1 and American Healthcorp's Exhibit 1.

Respondent HRS presented the testimony of Eugene Nelson, who was accepted as an expert witness in the area of health planning.

Subsequent to the hearing, counsel for each of the petitioners and intervenors and the respondent submitted proposed findings of fact and proposed conclusions of law. To the extent that the parties' proposed findings of fact are not incorporated in this Final Order, they are rejected as being either not supported by competent substantial evidence adduced at the hearing, irrelevant or immaterial to the issues in dispute or as constituting legal conclusions as opposed to factual findings.

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced at the hearing, the following relevant facts are found:

(1) Each of the petitioners and intervenors are owners, operators and/or applicants for acute care hospital facilities in Florida.

(2) Prior to the challenged proposed rule, HRS had no separate rule setting forth the criteria or methodology to be utilized when reviewing applications for new or expanded osteopathic hospitals. By memoran-

dum dated March 1, 1984, the then Deputy Assistant Secretary for Health Planning and Development for HRS informed the HRS Acting General Counsel that because there were four applications for osteopathic hospitals due a decision by March 21, 1984, and because there was a great deal of confusion concerning how the need for osteopathic hospitals should be reviewed and addressed, "it would be to our advantage to have a written policy in place within the next week." An Assistant General Counsel prepared a four-page document dated March 7, 1984, which analyzed the appellate decision in *Gulf Coast Hospital, Inc. v. HRS*, 424 So.2d 86 (Fla. 1st DCA 1982) and three administrative orders involving Certificate of Need applications for osteopathic hospitals.

(3) HRS rules, particularly those dealing with the Certificate of Need program, are generally prepared by the Office of Comprehensive Health Planning. In this instance, Mr. Eugene Nelson, the Administrator of the Office of Community Medical Facilities, prepared and drafted the challenged rule.

(4) Prior to the preparation and approval of the proposed rule, which, according to the notice appearing in Volume 10, No. 18 of the Florida Administrative Weekly (May 4, 1984), was accomplished on April 6, 1984, HRS held no public workshops, formed no task force to study osteopathic bed need, and did not consult with or receive any input from the Statewide Health Council, local health councils, existing osteopathic or allopathic facilities or professional associations. After publishing the proposed rule on May 4, 1984, HRS did hold an informal public hearing and received written comments. Neither the transcript of the hearing nor the written comments had been reviewed by Mr. Nelson as of the date of the instant rule-challenge hearing.

(5) The proposed rule adds a new subsection to existing Rule 10-5.11, Florida Administrative Code, which contains the criteria for evaluating applications for Certificate of Need. Proposed Rule 10-5.11(28) sets forth the criteria for evaluating osteopathic acute care bed need, and provides as follows:

(a) "Osteopathic acute care hospital" or "osteopathic hospital" means, for the purposes of administration of the Health Facilities and Health Services Planning Act (Sections 381.493-381.499, Florida Statutes), a hospital which:

1. Has or proposes to have licensed doctors of osteopathy (D.O.s) in the capacities of Chief of Staff, Medical Director, chiefs of each medical department, and director of any residency or training program; and

127

2. Has or proposed to have, on its premises, facilities and equipment to perform osteopathic manipulative therapy.

Notwithstanding the above, nothing in this paragraph shall apply to osteopathic hospitals in existence prior to the effective date of this rule. Identification of such hospitals shall be consistent with the current inventory of osteopathic acute care hospitals as shown in reference material filed with the Department of State.

(b) Application for proposed osteopathic acute care hospital beds will be reviewed according to relevant statutory and rule criteria. A favorable need determination for proposed osteopathic acute care hospital beds will not normally be given to an applicant unless a bed need exists according to paragraph (28)(c) of this rule. A favorable need determination may be made when the criteria, other than as specified in (28)(c), as provided for in 381.494(6)(c), Florida Statutes, and the remainder of Rule 10-5.11, Florida Administrative Code, demonstrate need.

(c) The need for osteopathic acute care hospital beds shall be calculated in conjunction with Rule 10-5.11(23) and analyzed on a service district level only. The need for such beds in a service district shall be 5% of that service district's total acute care bed need as determined by Rule 10-5.11(23), notwithstanding the supply of existing and approved non-osteopathic acute care hospital beds in the service district.

In determining whether a need exists for additional osteopathic acute care hospital beds, however, the department shall consider the supply of existing and approved osteopathic acute care hospital beds in the service district and shall deduct this supply from the calculation of bed need in making such determination.

(d) In addition to the methodology contained in (28)(c), the department shall consider the following criteria and standards in reviewing proposals for additional osteopathic acute care hospital beds:

1. The historical and current utilization of all existing osteopathic acute care hospital beds in the service district;

2. The number of licensed and approved osteopathic acute care hospital beds in the service distrct;

3. The supply of licensed D.O.'s in reasonable proximity to the location of the proposed osteopathic hospital;

4. The historical and current utilization by D.O.'s of all non-

128

osteopathic hospitals in the service district, except in those instances where discrimination against D.O.'s has regularly occurred.

(e) An applicant who cites discrimination in the granting or denial of hospital staff membership or professional clinical privileges as a reason for the application shall include, as part of the application, evidence that the remedies provided for in Section 395.006(1), Florida Statutes, have been followed.

(f) Each proposed new osteopathic hospital must be accredited by the American Osteopathic Association (AOA) within two years of initial operation. Each existing hospital proposing additional osteopathic acute care hospital beds must be AOA-accredited; and meet the requirements under sections (a) 1. and 2.

(g) In no event shall historical and current utilization of all hospital beds by all physicians be used to determine need for osteopathic acute care hospital beds.

(h) All existing and approved osteopathic acute care hospital beds shall be included in the department's inventory of total existing and approved acute care beds.

(6) Subsection (a) of the proposed rule basically defines an osteopathic hospital in terms of its staff and facilities and then "grandfathers" those osteopathic hospitals which are in existence prior to the effective date of the rule. Such hospitals are to be identified by the "current inventory of osteopathic acute care hospitals as shown in reference material filed with the Department of State." According to Mr. Nelson, the inventory referred to in the proposed rule is a directory of osteopathic hospitals prepared by the Florida Osteopathic Medical Association (FOMA). Mr. Nelson had no knowledge of the criteria which FOMA utilized to develop this list, nor did he scrutinize each hospital to determine if it was, indeed, an "osteopathic" facility. At least one hospital, Humana Hospital of the Palm Beaches, was removed by HRS from the FOMA list based on a Recommended Order from a Hearing Officer in a Certificate of Need proceeding finding that Humana was no longer an osteopathic hospital. Humana was not a party to that proceeding. The FOMA list does not include those hospitals whose medical staffs are comprised of a large percentage of osteopathic physicians.

(7) Acute care hospitals licensed by the HRS Office of Licensure and Certification are either "general" or "special" hospitals. They are not licensed as "osteopathic" or as "allopathic" hospitals. The appointment or election of medical staff positions within a hospital are internal matters for each facility and HRS has no authority to control such

matters. Florida's Hospital Licensing and Regulation Law does prohibit a licensed facility from denying staff privileges to an individual based upon the individual's status as a Doctor of Osteopathy, a Doctor of Medicine, a Doctor of Dentistry or a Doctor of Podiatry. Section 395.011, Florida Statutes.

(8) Subsection (f) of the proposed rule requires accreditation by the American Osteopathic Association (AOA) within two years of initial operation of new osteopathic hospitals and before existing hospitals propose additional osteopathic acute care beds. Both Mr. Nelson and the Director of the Office of Licensure and Certification were unaware of AOA accreditation requirements. There are no statutory requirements for AOA accreditation for osteopathic hospitals.

(9) Utilizing the FOMA list of osteopathic hospitals, osteopathic beds comprise approximately five percent of the total number of licensed acute care hospital beds in Florida. The number of osteopathic physicians licensed in Florida, without regard to the nature of their practice or the location of their residence, is approximately five percent of the total number of allopathic physicians licensed in Florida. These two factors form the basis for the quantitative osteopathic bed need methodology set forth in subsections (b) and (c) of the proposed rule. The rule provides that need for osteopathic beds in a given HRS service district is five percent of the total number of acute care hospital beds shown to be needed for such District pursuant to the acute care bed need formula contained in Rule 10-5.11(23), Florida Administrative Code. The acute care bed need formula set forth in Rule 10-5.11(23) basically employs statewide utilization rates to determine each District's bed allocation and then adjusts each District's allocation based upon that District's specific historical utilization experience. The District's gross osteopathic bed need, as determined by the five percent formula contained in the proposed rule, is then to be reduced by the number of existing and approved osteopathic beds. The actual supply of existing and approved non-osteopathic acute care beds in the service district is not to be considered in determining the osteopathic bed need. Conversely, existing and approved osteopathic beds are to be included in the inventory of total existing and approved beds. Subsection (h) of the proposed rule. While historical and current utilization of both existing osteopathic beds and the utilization by osteopathic physicians of beds in non-osteopathic hospitals are factors for consideration (subsdection (d) 1 and 4), HRS may not consider historical and current utilization of all hospital beds by all physicians. Subsection (g) of the proposed rule.

(10) The workings of the proposed rule can be exemplified by

130

assuming a hypothetical District with an overall acute care bed need, as determined pursuant to Rule 10-5.11(23), Florida Administrative Code, of 1,000 beds. If no osteopathic beds currently exist in the District, 50 such beds would be approvable under the proposed rule, regardless of the number or occupancy levels of non-osteopathic beds existing in that District. If the District currently has 800 beds, 50 osteopathic beds would be approved. If the District currently has 1,400 beds, 50 osteopathic beds would still be approved. If existing non-osteopathic hospitals in the District have occupancy rates of 20% or 100%, this factor is not to be considered. Conversely, the utilization of existing osteopathic hospital beds is a factor for consideration. Whether the number 50 in this hypothetical District is a minimum, a maximum or just a guideline for the permissible number of osteopathic beds was a subject of confusion among the witnesses who testified at the hearing. Also subject to confusion was whether the proposed rule has the effect of limiting non-osteopathic facilities to 95% of the toal bed need as computed under Rule 10-5.11(23), Florida Administrative Code.

(11) In determining the need for osteopathic and allopathic beds in a given area, it is the generally accepted practice of health planning experts to consider such factors as historical, current and projected utilization or occupancy rates of existing acute care beds, the average of length of patient stays, and the admission rates of physicians (recognizing the differences in admission practices among specialties and types of physicians). Another useful predictor of need for osteopathic facilities would be the use of such facilities by non-osteopathic physicians and the use of non-osteopathic beds by osteopathic physicians. No attempt was made by HRS to include these health planning techniques in its methodology for determining the need for osteopathic beds.

(12) There are eleven HRS service districts in Florida which vary in composition from one county to sixteen counties. Osteopathic hospitals, as determined by the FOMA list, are not evenly distributed throughout the State. Indeed, such hospitals are located in only 8 of Florida's 67 counties. Four of HRS's Districts have no osteopathic beds, while some 80% of the total number of osteopathic beds (2,020 out of 2,504) are concentrated in four Districts. There is no evidence that Florida's osteopathic physicians are evenly distributed among the Districts.

(13) Occupancy levels in osteopathic hospitals for the years 1982 and 1983 have, on a statewide basis, been lower than that experienced in non-osteopathic acute care hospitals. For the year 1982, the District osteopathic occupancy rates for those Districts which had osteopathic facilities ranged from 36.4% to 88.5%, with a statewide average of

54.1 percent. The allopathic occupancy rate for the same year ranged from 66.8% to 74.4% among all Districts, with a statewide average of 70.2 percent. The range for osteopathic occupancy rates in 1983 was from 33.9% to 85.7%, with a statewide average of 50.9 percent. The corresponding allopathic occupancy rates were 64.7% to 77.7%, with a statewide average of 68.2 percent. The optimal occupancy level for acute care hospitals is generally considered to be 80 percent.

(14) Pursuant to Rule 10-5.11(23), Florida Administrative Code, the statewide total acute care bed need for the year 1988 is 49,278 beds. Under proposed Rule 10-5.11(28), the total osteopathic bed need for 1988 is 2,463 beds. As of March 15, 1984, there were 51,256 licensed and approved allopathic beds and 2,504 licensed and approved osteo-pathic beds, for a total acute care bed count of 53,760. Thus, under the operation of both rules, for the 1988 planning year, Florida is overbed-ded by over 4,400 allopathic beds and over 40 osteopathic beds on a statewide basis. Yet, the net result of applying the proposed rule's 5% formula to each District is to allow the approval of an additional 896 new osteopathic acute care beds. Adding this number to ths number of existing osteopathic beds would result in a ratio of osteopathic to allopathic beds of over 6 percent. The operational effect of the pro-posed rule on a District basis would be to allow an additional 85 osteopathic beds in District 6 (a District already overbedded by 1,029 beds), even though that District already has 1983 osteopathic beds operating at occupancy levels of 35.3 percent. Yet, District 7, which shows a surplus of only 170 beds, would receive only 64 osteopathic beds in spite of the fact that its osteopathic occupancy level in 1983 was 85.7 percent. District 11 would show a need under the proposed rule for 120 additional osteopathic beds, even though that District is currently overbedded by over 1,500 beds and experienced an osteo-pathic occupancy level of 56.5% and an allopathic occupancy level of 64.7% in 1983. The proposed rule would allow 323 osteopathic beds to be established in 3 of the 4 Districts lacking such beds, even though those 3 Districts are currently overbedded by almost 500 beds.

(15) Under the proposed rule, an application for osteopathic acute care beds will not normally be granted unless the 5%' criterion is met. The rule then commands HRS to also consider additional criteria: the number of and utilization of existing osteopathic beds, the supply of licensed D.O.s in "reasonable proximity" to the proposed osteopathic hospital and the historical and current utilization by D.O.s of non-osteopathic hospitals, unless discrimination against D.O.s has regularly occurred. The rule contains no indicia of quantification of these additional criteria. The manner in which these factors are to be treated

132

in the Certificate of Need process is not disclosed. Mr. Nelson candidly admitted that at least two of these factors could work either in favor of approval or in favor of disapproval of an application for new osteopathic acute care beds.

(16) The Economic Impact Statement (EIS) prepared by HRS for this proposed rule quantifies the publication, printing and mailing costs of the proposed rule for HRS. In the section entitled "Cost or Economic Benefit to Persons Directly Affected," the EIS notes that the rule is "expected to promote an orderly development" of osteopathic hospitals throughout the state and that applicants proposing osteopathic facilities will be able to determine the number of beds available for Certificate of Need approval. The EIS concludes that the additional criteria "are expected to help contain health care costs" and that the rule is expected to provide more equitable access to osteopathic beds for both applicants and patients. As to the impact on competition and the open market for employment, the EIS concludes that applicants, while competing for fewer beds than those that may be available under Rule 10-5.11(23), would now be able to compete on a more equal basis. Finally, the EIS points out that osteopathic physicians able to document discrimination would stand a better chance of a favorable decision on their application. The only data and method listed for making these conclusions was a review and comparison of Rule 10-5.11(23) and a review of Certificate of Need applications for osteopathic acute care beds.

(17) Experience with the Certificate of Need process illustrates that once a bed need is quantified and announced, those beds are rapidly applied for and approved. It is also an accepted principle that decreased occupancy levels in existing facilities generally result in increased health care costs. This is because a hospital's fixed costs must be spread over relatively fewer patients.

(18) No attempt was made in the EIS to assess the impact which the proposed rule may have on acute care bed surpluses in Florida or on existing allopathic facilities which currently have osteopathic physicians on their medical staffs. No consideration was given to the effect which the proposed rule may have upon competition for patients between existing allopathic and osteopathic facilities. Existing utilization or occupancy levels of either osteopathic or allopathic facilities were not considered by the person who prepared the EIS. The economic impact of giving osteopathic beds a preference over allopathic beds (in the sense that the supply of allopathic beds are not to be considered while the supply of osteopathic beds are to be included in the total bed inventory) was not discussed in the EIS.

133

## CONCLUSIONS OF LAW

As existing acute care hospitals and/or applicants for such hospitals, both allopathic and osteopathic, each of the petitioners and intervenors are substantially affected by a proposed rule which sets forth the methodology and criteria to be utilized by HRS in determining whether to grant approval for new or expanded acute care hospitals. While the proposed rule purports to apply only to osteopathic acute care hospitals, its impact upon all acute care facilities is apparent. Indeed, it can easily be concluded from the testimony of the agency's own personnel that the proposed rule in effect amends the general acute care bed rule (Rule 10-5.11(23), Florida Administrative Code) by limiting allopathic facilities to 95% of the total bed need demonstrated by that rule. The petitioners and intervenors have adequately illustrated their standing to challenge proposed Rule 10-5.11(28), pursuant to Section 120.54(4), Florida Statutes.

This challenge is based upon both procedural and substantive grounds. It is alleged that the economic impact statement prepared for the proposed rule is inadequate, erroneous and deficient; that the proposed rule unlawfully incorporates the standards of other agencies (i.e., the American Osteopathic Association's accreditation requirements and the Florida Osteopathic Medical Association's list of osteopathic hospitals) with no knowledge or awareness on the part of HRS as to the underlying basis for such standards; and that HRS failed to consult, as required by Section 381.494(8)(b), Florida Statutes, with the Statewide Health Council, local health councils, hospitals and professional associations in promulgating this rule. Substantively, it is urged that the rule is arbitrary and capricious, is vague and is inconsistent with and contrary to both the enabling legislation (the Certificate of Need law) and the licensing law. It is further alleged that the proposed rule violates the mandate of the District Court of Appeal in *Gulf Coast Hospital, Inc. v. HRS*, 424 So.2d 86 (Fla. 1st DCA 1982).

In attacking an agency rule, as inconsistent with statutory authority or an abuse of discretion, the challengers have the burden of proof. *Agrico Chemical Company v. Department of Environmental Regulation*, 365 So.2d 759 (Fla. 1st DCA 1979). Proposed agency rules should be upheld if they are appropriate to the end specified in the legislative act, as reasonably related to the act and are not arbitrary and capricious. An arbitrary decision is one not supported by facts or logic. Capricious action is one which is taken without thought or reason or irrationally. *Agrico Chemical*, supra.

Having reviewed all the evidence and carefully considered the

134

argument of counsel, it is concluded that the substance of the proposed rule is violative of the Certificate of Need law and the licensing law, is vague in some of its provisions and operates in an arbitrary and capricious manner. The overriding purpose of the Certificate of Need program is the containment of health care costs by finding and defining areas of need on a community basis and by eliminating unnecessary duplications of health services. Section 381.493(2), Florida Statutes. The need for osteopathic facilities are to be "determined on the basis of the need for and availability of osteopathic services and facilities in the community." Section 381.494(2), Florida Statutes. This statutory provision has received further amplification in the *Gulf Coast* case, supra, to require that the need for osteopathic facilities be considered "separately" from the need for non-osteopathic services. The licensing law prohibits licensed facilities from denying staff privileges to an individual based upon his or her status as an M.D., a D.O., a dentist or a podiatrist. Section 395.011(1), Florida Statutes. The same statute, as amended on October 1, 1982, states that proof of discrimination in the granting or denial of hospital staff membership is not a pre-condition to obtaining a Certificate of Need. Section 395.011(6), Florida Statutes.

Proposed Rule 10-5.11(28), violates the above statutory provisions and interpretations in several respects. First, the Certificate of Need program is based upon the premise of accomplishing its goals through health care planning on a "community" basis. Osteopathic need is specifically to be considered on a "community" basis. Whether the "community" be considered a county (a position assumed by HRS on numerous occasions), a District or some other geographic area, the "community" needs for osteopathic services are to be separately assessed and analyzed. This challenged rule, by utilizing statewide statistics with regard to the number of osteopathic physicians and osteopathic beds in relationship to the number of allopathic physicians and beds, and then applying such statewide statistics to each of the eleven Districts fails to respond to the issue of osteopathic need in the "community." The proposed rule's 5% methodology contains no reality test to insure that the statewide data or purported "need" bears any relationship to the actual District or community need. The sweeping imposition of two statewide ratios to determine local need appears to be without thought, reason or logic. At the time of the hearing in this case, the actual distributions of Doctors of Osteopathy among the eleven Districts was not known by the drafters of this rule. The reality that all existing osteopathic facilities are now located in eight of Florida's sixty-seven counties and operate at varying levels of occupancy or utilization was not given consideration. Acceptance of the

135

statewide ratio of physicians and beds, without considering location and utilization, and applying this figure to each of the eleven Districts, is not a rational health planning technique inasmuch as it bears no reasonable relationship to the actual need in each community. There is simply no factual basis in the record of this proceeding to demonstrate that the 5% ratios provide any indication of need for osteopathic beds in each of Florida's communities or Districts.

The operational consequences of the proposed rule illustrate the arbitrary and capricious nature of its contents. The rule results in the approval of additional osteopathic hospital beds in areas that are already overbedded in general, even where existing osteopathic hospitals have extremely low occupancy. Without any illustration of "need," the proposed rule gives a preference for osteopathic facilities over allopathic facilities in some Districts and actually limits such facilities in other Districts where need may exist. The rationale of using the 5% ratio of osteopathic beds and physicians to total beds and physicians as a basis for approving beds becomes particularly troublesome when its end result is to allow osteopathic beds in excess of 6% of the total beds. The proposed rule simply does not contain enough flexibility to respond to or identify the unique circumstances that exist within a particular community or district.

While the additional criteria set forth in subsection (d) 1 through 4 of the rule purport to take some of the typical health planning considerations into effect, the rule contains no guidance as to the quantitative effect to be given such considerations. HRS admitted that the various factors could operate in favor of or against Certificate of Need approval. In addition, condition (d) 4 appears to add a requirement of a demonstration of discrimination, contrary to Section 395.011(6), Florida Statutes.

Other portions of the proposed rule appear to be violative, or at least inconsistent with, statutory provisions and interpretations. The requirement that an osteopathic hospital fill its elective key medical positions with only Doctors of Osteopathy presents a clear conflict with Section 395.011(1), Florida Statutes, which prohibits health care facilities from discriminating among classes of physicians. The proposed rule assumes that the need for osteopathic beds is 5% of the need for general acute care beds as determined by existing Rule 10-5.11(23), Florida Administrative Code. This rule is at least partially based upon the historical utilization of non-osteopathic beds. By connecting osteopathic and non-osteopathic need, it would appear that the need for osteopathic facilities is not being considered separately, as required by Section 381.494(2), Florida Statutes, and as interpreted by the decision in *Gulf*

136

*Coast*, supra. In this same regard, the proposed rule is literally self-contradictory. While osteopathic need is to be calculated in conjunction with the acute care bed need formula set forth in Rule 10-5.11(23), subsection (g) of the proposed rule prohibits a consideration of historical and current utilization of all hospital beds by all physicians. In addition, no statutory authority has been found or cited for the requirement that osteopathic facilities be accredited by the American Osteopathic Association as a condition for Certificate of Need approval. The adoption of such standards by rule, along with the HRS's adoption of a list of hospitals prepared by the Florida Osteopathic Medical Association as a basis for determining grandfather status, is particularly troublesome given the agency's lack of awareness of the standards used by such agencies.

Subsection (e) of the proposed rule again refers to a showing of discrimination. That provision requires evidence by the applicant that the remedies provided for in Section 395.006(1), Florida Statutes, have been followed. That cited section simply requires HRS to make such inspections and investigations as it deems necessary. While this may have been a technical oversight on the part of the drafters of this proposed rule, it further points to the need for HRS to give more detailed attention to the subject of osteopathic acute care bed need in Florida.

A more detailed consideration than that which occurred in this stance is indeed mandated by Section 381.494(8), Florida Statutes. While HRS has the authority to promulgate rules and standards for the issuance of Certificate of Need, it is to do so "with the advice of the Statewide Health Council," and it is to consult

"with the local health councils and with such hospital, nursing home, and professional associations and societies and other agencies, as it deems advisable. . . ." Section 381.494(8)(b), Florida Statutes.

This was not done prior to the drafting and approval of the challenged rule and the later comments received at the public hearing were not taken into consideration by those charged with the duty of promulgation and implementation of this rule.

The lack of agency introspection into the instant rule-making process is exemplified, not only by its failure to consult with other health planning bodies and interested entities, but also by the inadequacy of the economic impact statement prepared for the challenged rule. The EIS contains both errors and omissions. While a conclusion is stated in the EIS that the proposed rule, particularly by consideration of the four criteria proposed in subsection (d), is "expected to help contain

**137**

health care costs," the drafter of the EIS had little knowledge of the actual operation and effect of the rule. The evidence demonstrates that, at least in some Districts, the proposed rule will have the effect of increasing excess supply, decreasing occupancy rates and thereby increasing charges to health care consumers in Florida. In other Districts, actual need for osteopathic facilities may not be met because of the 5% cap imposed by the rule. Yet, the EIS neither articulates nor analyzes the effect of the proposed rule upon occupancy rates, costs or charges. The competitive configuration between osteopathic and allopathic providers is not addressed in the EIS. The impact of the rule upon existing providers is nowhere addressed. The EIS concludes that applicants proposing new or expanded osteopathic facilities will be able to determine the number of beds available for approval, as well as the likelihood of favorable action on their requests. The testimony of HRS employees charged with the implementation of the rule belies such a conclusion. Whether the 5% methodology was a maximum figure, a minimum figure or a guideline was the subject of varying interpretation within the agency itself. How the additional criteria would be reviewed and applied was likewise subject to differing views. If the agency itself is confused as to the operation of its own rule, how is an applicant to determine the number of beds needed or the likelihood of favorable action on its request? Another deficiency in the EIS, which perhaps explains the others, is that there is no listing of data or methodologies used to estimate the economic impact of the proposed rule. Likewise, there was no evidence presented that HRS considered, independently from the preparation of the EIS, the economic factors and impact surrounding the implementation of the proposed rule. This failure of HRS to provide an adequate estimate of the rule's economic impact, along with its failure to receive advice and consult with other health planning bodies, providers and interested persons, no doubt contributed to the rule's invalid substantive provisions as discussed above.

In summary, it is concluded that the challenged proposed rule constitutes an invalid exercise of delegated legislative authority. By failing to consider the issue of need on a local or community basis and to consider the overall goal of cost containment, the proposed rule is not appropriate to the end specified in the Certificate of Need law. Indeed, many of its provisions are inconsistent with the Certificate of Need law, as well as the licensing law. The proposed rule was drafted in a hasty, arbitrary and capricious fashion and, as a result thereof, its operational effect would be irrational. The proposed rule is unsupported by an adequate statement of economic impact.

138

## FINAL ORDER

Based upon the findings of law and conclusions of law recited herein, it is

ORDERED that the Department of Health and Rehabilitative Services' proposed Rule 10-5.11(28), as it appears in Volume 10, No. 18 of the Florida Administrative Weekly (May 4, 1984) constitutes an invalid exercise of delegated legislative authority.